IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | 8:12-CR-291 |
| vs. | |
| SABAS RODRIGUEZ-CISNEROS, | TENTATIVE FINDINGS |
| Defendant. | |

The Court has received the revised presentence investigation report and addendum in this case. The defendant has filed an objection to the revised report and addendum (filing 33). The defendant has also filed a motion for variance from the sentencing guidelines (filing 34).

IT IS ORDERED:

1. The Court will consult and follow the Federal Sentencing Guidelines to the extent permitted and required by *United States v. Booker*, 543 U.S. 220 (2005), and subsequent cases. In this regard, the Court gives notice that, unless otherwise ordered, it will:

    (a) give the advisory Guidelines such weight as they deserve within the context of each individual case and will filter the Guidelines' advice through the 18 U.S.C. § 3553(a) factors, but will not afford the Guidelines any particular or "substantial" weight;

    (b) resolve all factual disputes relevant to sentencing by the greater weight of the evidence and without the aid of a jury;

    (c) impose upon the United States the burden of proof on all Guidelines enhancements;

    (d) impose upon the defendant the burden of proof on all Guidelines mitigators;

    (e) depart from the advisory Guidelines, if appropriate, using pre-*Booker* departure theory; and

(f) in cases where a departure using pre-*Booker* departure theory is not warranted, deviate or vary from the Guidelines when there is a principled reason justifying a sentence different than that called for by application of the advisory Guidelines, again without affording the Guidelines any particular or "substantial" weight.

2. The defendant has filed an objection to the revised presentence investigation report and addendum (filing 33). Specifically, the defendant objects to the increase in the offense level from 8 to 12 pursuant to U.S.S.G. § 2B1.1(b)(11)(A)(ii), which provides a two-level enhancement in the offense level (or an increase to level 12 if the result is less than level 12) if the offense involved the "possession or use" of an "authentication feature" of an identification document.

The term "authentication feature" is defined by reference to 18 U.S.C. § 1028(d)(1), as

> any hologram, watermark, certification, symbol, code, image, sequence of numbers or letters, or other feature that either individually or in combination with another feature is used by the issuing authority of an identification document, document-making implement, or means of identification to determine if the document is counterfeit, altered, or otherwise falsified[.]

*See* U.S.S.G. § 2B1.1 cmt. 9(A) (2011) (adopting definition from § 1028(d)(1)). The probation officer concluded that this enhancement was applicable because the defendant used a Social Security card not issued to him, which includes a Social Security number. The defendant objects that he did not "use" the "authentication feature" of the card. The § 2B1.1(b)(11) enhancement, he argues, "was designed to punish more harshly those offenders who themselves possess *the means* to create sophisticated fakes (that is, the authentication features *themselves*)— not the end users who lack the ability to reproduce or manipulate the authentication feature." Filing 33 at 3.

The Court does not find this argument persuasive. A separate subsection of the § 2B1.1(b)(11) enhancement—§ 2B1.1(b)(11)(B)(ii)—is expressly applicable to the "production or trafficking" of an authentication feature. The enhancement was clearly intended to

discourage sophisticated counterfeiting, but this can also be accomplished by punishing those who benefit from it, even if they cannot do it themselves. And that benefit was realized when the identification document possessed by a defendant was accepted as valid, presumably (at least in part) because it displayed or accurately reproduced official authentication features.[1] In short, the Court is persuaded that an end user "uses" an authentication feature within the meaning of § 2B1.1(b)(11)(A)(ii) by making use of the identification document on which it is displayed. *See United States v. Baker, 435 Fed. Appx. 2, 4 (D.C. Cir. 2011).*

The Court has a more fundamental problem with applying the enhancement, however, at least on the facts currently presented—the Court is not persuaded that a Social Security number, standing alone, is an "authentication feature" within the meaning of the relevant statutory and Guidelines provisions.[2] The Court accepts that a Social Security card is an "identification document." *See United States v. Quinteros, 769 F.2d 968 (4th Cir. 1985).* And the definition of "authentication feature" includes a "sequence of numbers or letters." But the Court is not convinced that a Social Security number is "used by the issuing authority . . . to determine if the document is counterfeit, altered, or otherwise falsified[.]"

The source of the statutory definition is the SAFE ID Act of 2003, Pub. L. No. 108-21, § 607, 117 Stat. 650, 689-91 (2003), and the conference report for that legislation explains its purpose:

> Under current law, it is not illegal to possess, traffic in, or use false or misleading authentication features whose purpose is to create fraudulent IDs. [This section] would

---

[1] The record suggests that the Social Security card used in this case may have been genuine, albeit not the defendant's. The Court does not view this as significant. Section 1028(d) clearly distinguishes between "authentication features" and "false authentication features," and § 2B1.1(11) adopted the more general term.

[2] The addendum to the presentence investigation report simply refers to "the sequence of numbers" on the Social Security card. The Court assumes that this is a reference to a Social Security number. The Court is aware that recently issued Social Security cards contain more advanced security features. *See*, 42 U.S.C. § 405(c)(2)(G); Social Security Administration, Program Operations Manual System, RM 10201.060 (2012), *available at* http://policy.ssa.gov/poms.nsf/. If the card at issue in this case displayed such features, then the government should be prepared to present evidence to that effect at sentencing.

> correct this oversight by making it a crime to counterfeit or alter "authentication features," as well as to traffic such features in false identification documents or without the authorization of the appropriate authority. *Authentication features are the holograms, symbols, codes, etc., used by the issuing authority to verify that an ID is authentic.* In addition, this section requires forfeiture of equipment used in creating or trafficking in illicit authentication features. This section will help the fight against child abduction, terrorism, identity theft, and underage drinking, among other things, by addressing the growing trade in illicit authentication feature for IDs.

H. Conf. Rep. No. 108-66, at 67 (2003) (emphasis supplied). In other words, the legislation was passed because Congress found that it was not already unlawful to use misleading authentication features. But the false use of a Social Security number had been unlawful since at least 1972. *See* Social Security Amendments of 1972, Pub. L. 92-603, § 130, 86 Stat. 1329, 1359-60 (1972). This suggests that a Social Security number was not thought of as an authentication feature.

But more to the point, the obvious purpose of the legislation—both from its history and its plain language—was to address anti-counterfeiting measures. *See e.g. United States v. Elmardoudi*, 611 Fed. Supp. 2d 879, 987 (N.D. Iowa 2008). A Social Security number, by contrast, is clearly a "means of identification" as defined by the statute: a "name or number that may be used, alone or in conjunction with any other information, to identify a specific individual," including a Social Security number or driver's license number. § 1028(d)(7). The purpose of a Social Security number is identification, not security. The two categories are not necessarily mutually exclusive, but the distinction is helpful. Any "means of identification" could presumably be used to detect deception, because it could be used to discover that the person presenting the identifying document is not actually the person identified. The fact that Congress drew a distinction between a "means of identification" and a "authentication feature" suggests that the latter should be a feature primarily used for security.

And it is important to note that if identifying information is construed to be an "authentication feature" within the meaning of § 1028(d)(1) and § 2B1.1(11)(A), then the sentencing enhancement would apply to

*any* offense involving an identification document, mine-run or otherwise, because it is difficult to imagine an identification document that does not include a means of identification. Crimes involving an identification document would thus have a de facto minimum offense level of 12—a result the Court is reluctant to impose unless such an intent is more clearly expressed by Congress or the Sentencing Commission.

While the starting point for interpreting a statute is the language of the statute itself, a court engaging in statutory construction must interpret the words of the statute in light of the purposes Congress sought to serve. *Westerfeld v. Indep. Processing, LLC*, 621 F.3d 819, 824 (8th Cir. 2010). In ascertaining the plain meaning of the statute, a court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole. *United States v. I.L.*, 614 F.3d 817, 820 (8th Cir. 2010). When the context and purpose of § 1028 are considered, it is evident that the primary function of an "authentication feature" within the meaning of § 1028(d)(1) should be its use by the issuing authority to determine if an identification document is counterfeit, altered, or otherwise falsified. That is not a Social Security number's primary function.

The Court will consider the evidence presented at sentencing, and the arguments of counsel. But in the absence of additional evidence, for the reasons stated above, the Court's *tentative* finding is that the § 2B1.1(b)(11)(A)(ii) enhancement is not applicable in this case.

3. The defendant has also filed a motion for variance from the sentencing guidelines (filing 34). The defendant argues that based on his history and circumstances, and the § 3553 factors, a sentence of time served is warranted. The defendant's motion appears to be contingent upon his objection to the presentence report; if the § 2B1.1(11)(A) enhancement is not applied, a time-served sentence would appear to be within the Guidelines range. Nonetheless, the Court will resolve the defendant's motion for variance at sentencing.

4. Except to the extent, if any, that the Court has sustained an objection, granted a motion, or reserved an issue for later resolution in the preceding paragraph, the parties are notified that the Court's tentative findings are that the presentence report is correct in all respects.

5. If any party wishes to challenge these tentative findings, that party shall, as soon as possible (but in any event no later than three (3) business days before sentencing) file with the Court and serve upon opposing counsel an objection challenging these tentative findings, supported by a brief as to the law and such evidentiary materials as are required, giving due regard to the local rules of practice governing the submission of evidentiary materials. If an evidentiary hearing is requested, such filings should include a statement describing why a hearing is necessary and how long such a hearing would take.

6. Absent timely submission of the information required by the preceding paragraph, the Court's tentative findings may become final and the presentence report may be relied upon by the Court without more.

7. Unless otherwise ordered, any objection challenging these tentative findings shall be resolved at sentencing.

Dated this 10th day of January, 2013.

BY THE COURT:

*John M. Gerrard*
John M. Gerrard
United States District Judge